**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA ANYANWU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-CV-02722-NCC |
| | ) | |
| ASCENSION HEALTH, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Patricia Anyanwu's Motion for Summary

Judgment (Doc. 33) and Defendant Ascension Health's Motion for Summary Judgment (Doc.

34). The Motions are fully briefed and ready for disposition. (Docs. 33, 34, 36, 39, 40, 41, 45,

46.) The parties have consented to the jurisdiction of the undersigned United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 12.) For the following reasons, Plaintiff's

Motion will be **DENIED**, Defendant's Motion will be **GRANTED**, and this action will be

**DISMISSED, with prejudice**.

### I. Background

The undisputed facts are as follows.[1] On November 16, 2017, Plaintiff Patricia Anyanwu

("Plaintiff") filed this action against Ascension Health ("Ascension") under the Employee

---

[1] The undisputed facts are taken from Plaintiff's Statement of Material Uncontroverted Facts
(Doc. 32) and Defendant's Response to Plaintiff's Statement of Material Uncontroverted Facts
(Doc. 41), both of which were filed in connection with Plaintiff's Motion for Summary
Judgment. In addition, the facts are taken from Ascension's Statement of Uncontroverted
Material Facts in Support of Summary Judgment (Doc. 35), which was filed in connection with
Defendant's Motion for Summary Judgment, and to which Plaintiff did not respond. In
responding to Defendant's cross-Motion for Summary Judgment, Plaintiff states, "in order to
avoid redundancy and wasting of the Court's time and resources, Plaintiff would respectfully
request her Motion and Statement of Facts be considered as Plaintiff's response to the bulk of

Retirement Income Security Act of 1974 ("ERISA"), including 29 U.S.C. §§ 1132 (a)(1)(B) and 1133. (Doc. 1) Plaintiff alleges Defendant wrongly denied her long-term disability benefits. (*Id.*)

Plaintiff, currently sixty-one years old, was hired by Defendant on May 6, 2013. (Doc. 24 at AH 0103, 106; Doc. 35 ¶ 11.)[2] As of her last day of work on July 13, 2015, Plaintiff worked as a Solutions Development Senior Analyst, earning an annual salary of $93,079.00. (Doc. 24 at AH 0103, 0116, 0163.) According to her job description, Plaintiff was required to work with assigned customers/areas to translate business requirements into application systems/solutions. (Doc. 24 at AH 0163.) Plaintiff's responsibilities included working directly with users, responding to user problems, explaining new technologies, participating in project design, and troubleshooting tools and utilities. (Doc. 35 ¶ 12; Doc. 24 at AH 0113-0115.) Her job description defined the complexity of work as requiring critical thinking skills, decisive judgment, the ability to work with minimal supervision, and the ability to work in a stressful environment. (Doc. 24 at AH 0163.)

---

Defendant's argument . . . ." (Doc. 39 at 1.) However, Local Rule 4.01(E), E.D. Mo., requires the party opposing the Motion to include a statement of material facts as to which the party contends a genuine issue exists. That same Local Rule also requires the opposing party to note for all disputed facts the paragraph number from movant's listing of facts. Plaintiff did not comply with the Local Rule. Despite Plaintiff's blanket request, not properly submitted in the form of a motion, Plaintiff has not identified by paragraph the facts, if any, she disputes. Because Plaintiff failed to comply with the Local Rule, all matters set forth in the Defendant's Statement (Doc. 35) shall be deemed admitted for purposes of summary judgment. *See* E.D. Mo. L. R. 4.01(E). Finally, facts are taken from the Administrative Record, as a review in this case is limited to that record.

[2] The citations designated "AH ___" are citations to the multi-volume administrative record relating to this matter.

Defendant sponsors the self-funded Long-Term Disability Plan ("LTD Plan") for eligible employees working in the Ascension System Office ("System Office"). (Doc. 23 at AH 0005, 0012, 0079.) The LTD Plan is an employee welfare benefits plan governed by the Employee Retirement Income Security Act ("ERISA"). (Doc. 23 at AH 0079; Doc. 1 ¶ 3.) Defendant is the LTD Plan Sponsor and the Plan Administrator. (Doc. 23 at AH 0005, 0012, 0055, 0079.) Sedgwick Management Claims Services, Inc. ("Sedgwick") is the Claims Administrator of the LTD Plan. (*Id.* at AH 0047.) Defendant delegated discretionary authority regarding claims administration to Sedgwick. (*Id.* at AH 0017, 0047, 0056.) Plaintiff bought into the LTD Plan effective January 1, 2014. (Doc. 24 at AH 0103.) The LTD Plan defines "Disability/Disabled" as follows:

> 1.12 Disability/Disabled means that due to an Injury or Sickness which is supported by objective medical evidence,
> (a)  the Participant requires and is receiving from a Licensed Physician regular, ongoing medical care and is following the course of treatment recommended by the Licensed Physician; and
> . . .
>
> (1)  The Participant is unable to perform:
> (A)  during the first 24 months of Benefit payments, or eligibility for benefit payments, each of the Material Duties of the Participant's Regular Occupation;

(Doc. 23 at AH 0007–08.) "Injury" is defined as "accidental bodily injury that . . . results directly and independently of all other causes in loss covered by this Plan." (*Id.* at AH 0011.) Sickness is defined as "an illness, disease, medical condition or pregnancy." (*Id.* at AH 0013.) "Material Duties" and "Regular Occupation" are defined in the LTD Plan as follows:

> **Material Duties** means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted.
> . . .

> **Regular Occupation** means the activities that the Participant regularly performed when the Participant's Disability began. In addition to the specific position or job the Participant holds with the Participant's employer, Regular Occupation also includes other positions and jobs for which the Participant has training and/or education to perform in the Participant's profession at the Participant's Employer or any other employer. If the Participant's Regular Occupation involves the rendering of professional services and the Participant is required to have a professional or occupational license in order to work, the Participant's Regular Occupation is as broad as the scope of his or her license.

(*Id.* at AH 0011, 0013; *see also* AH 0056.)  Therefore, during the first 24 months of receipt of LTD benefit payments, an LTD plan participant must be unable to perform the activities that she regularly performed when her Disability began.  (Doc. 35 ¶ 8; Doc. 23 at AH 0007–0008, 0025.) This is referred to as the "Own Occupation Definition" of Disability.  (Doc. 35 ¶ 8.)

The Plan contains a Mental Illness Limitation, which limits benefits due to Mental Illness to 24 months.  (Doc. 35 ¶ 9; Doc. 23 at AH 0031.)  Mental Illness is defined as "a mental, emotional or nervous condition that is identified in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (or such later edition as is current at the time of the Disability) and is certified and treated by a licensed psychiatrist."  (Doc. 35 ¶ 9; Doc. 23 at AH 0012, 0055.) The Plan gave Sedgwick the discretion to certify a participant's mental illness on a temporary basis.  (Doc. 23 at AH 0012.)  The LTD Plan requires the Plan Participant to submit Proof satisfactory to the Claims Administrator (Sedgwick) of Disability.  (Doc. 35 ¶ 10; Doc. 23 at AH 0025.)  As defined in the Plan, "Proof means objective medical evidence, which in the discretion of the Claims Administrator, substantiates the existence of a Disability."  (Doc. 35 ¶ 10; Doc. 23 at AH 0013.)

Plaintiff applied for both short-term and long-term disability benefits under the Plan.  The chronology of events leading to her denial of LTD benefits is discussed below.  In addition to reports from Plaintiff's providers and examiners, this includes reviews by eight board certified

physician or neuropsychological advisors, an independent medical examination by a licensed neuropsychologist, and multiple peer-to-peer discussion and discussion attempts by these advisors with Plaintiff's treating physicians.

## A. Short-Term Disability Benefits Claim

On October 13, 2013, Plaintiff was in an auto-accident. She was rear-ended from behind, though her car suffered mild damage, and the vehicle air bags did not deploy. (Doc. 35 ¶ 13; Doc. 24 at AH 0153.) She was able to drive from the scene of the accident to work and was not admitted for treatment. (*Id.*) Plaintiff reported being on medical leave from November 2014 to May 2015. (Doc. 26 at AH 0990.)

More than a year after the accident, in February 2015, Plaintiff complained of cognition deterioration to her family practitioner, Dr. Enas Pruitt ("Dr. Pruitt"). (Doc. 35 ¶ 14; Doc. 24 at AH 0151–0154.) Accordingly, Dr. Pruitt referred Plaintiff to Neurologist John Bertelson ("Dr. Bertelson") for a traumatic brain injury ("TBI") assessment. (*Id.*) At that February 12, 2015 visit with Dr. Bertelson, the doctor noted that Plaintiff reported seeing stars and feeling dizzy right after the accident. (Doc. 41 ¶ 5(a); Doc. 24 at AH 0153.) Plaintiff also self-reported that her headache and cognition partially improved over the few months after the accident but that about six months after the accident, she was under a great deal of stress at work and her cognition deteriorated. (*Id.*) Dr. Bertelson assessed Plaintiff as having post-concussion syndrome resulting from the October 2013 car accident. (Doc. 35 ¶ 15; Doc. 24 at AH 0153.) He also assessed her as having memory impairment and insomnia. (Doc. 41 ¶ 5(d); Doc. 24 at AH 0153–54.) Dr. Bertelson found that Plaintiff's duration of symptoms was "unusual to be purely due to TBI [traumatic brain injury]" and noted that he suspected several factors were influencing Plaintiff's symptoms including anxiety, headache/muscle spasm, medications, and

sleep deprivation.  (Doc. 41 ¶ 5(e); Doc. 24 at AH 0153.)  Dr. Bertelson further stated that he was "ok with continued disability" to allow the medications he prescribed to take effect.  (Doc. 41 ¶ 5(e); Doc. 24 at AH 0154.)

After returning to work, Plaintiff again saw her primary care physician, Dr. Pruitt, on July 15, 2015, to follow-up on anxiety and depressive symptoms.  (Doc. 41 ¶ 5(f); Doc. 24 at AH 0220–21.)  At that visit, Plaintiff reported she had returned to work on June 1, 2015, but was "having difficulty dealing with her manager while at work."  (Doc. 35 ¶ 18; AH 0220).  She reported that the problems she was experiencing at work "caused increasing anxiety symptoms for her to the point where she has not been able to go to work yesterday or today due to difficulty dealing with her manager at work."  (Doc. 24 at AH 0220–21.)  Plaintiff did not attribute her problems to her car accident or possible traumatic brain injury.  (*See id.*)  Dr. Pruitt noted that Plaintiff had a flat effect and depressed mood.  (Doc. 41 ¶ 5(e)(i); Doc. 24 at AH 0221.)  His primary diagnosis was "adjustment reaction with anxiety" and "obesity."  (Doc. 35 ¶ 18; Doc. 24 at AH 0220–22.)  Dr. Pruitt's notes stated, "Because she is having such a hard time dealing with her current work situation I will take her off work for the next 2 weeks. If she needs to be off work longer than that, she will have had a chance to get in to see her psychiatrist who can make those further recommendations for her."  (Doc. 35 ¶ 18; Doc. 24 at AH 0222.)

Plaintiff sought short-term disability ("STD") benefits under another disability plan, the Ascension Short-Term Disability Payroll Program, claiming disability as of July 15, 2015.  (Doc. 35 ¶ 16; Doc. 24 at AH 0126–27.)  The STD Payroll Program is administered by the Ascension Ministry Service Center ("MSC").  (*Id.*)  On July 20, 2015, Dr. Pruitt submitted an Attending Physician Statement of Disability ("APS") to the MSC in which he stated that he advised Plaintiff to stop working as of July 15, 2015, with an expected return date of July 29, 2015.

(Doc. 35 ¶ 17; Doc. 41 ¶ 5(f)(ii); Doc. 24 at AH 0109.)  On July 27, 2015, Plaintiff's claim for STD benefits was approved by the MSC.  (Doc. 35 ¶ 19; Doc. 24 at AH 0103; AH 0116–19.) Plaintiff's short-term disability benefits start date was July 22, 2015.  (Doc. 24 at AH 0116.)

In a follow-up visit with Dr. Pruitt on July 28, 2015, Plaintiff reported that she was ready to return to work, but "request[ed] to be off work until she [was] able to be evaluated by the psychiatrist" on August 28, 2015.  (Doc. 35 ¶ 20; Doc. 24 at AH 0227, 1545.)  Dr. Pruitt noted in his psychiatric objective findings: "GAD-7 score is 20 which is in the severe anxiety category. Mildly anxious."  (Doc. 41 ¶ 5(g); Doc. 24 at AH 0227.)  Accordingly, in an APS dated July 28, 2015, and accompanying letter, Dr. Pruitt opined that Plaintiff should not work until seen by psychiatrist on August 28, 2015, and identified her expected return to work date to be September 1, 2015.  (Doc. 35 ¶ 20; Doc. 24 at AH 0112, 0158.)

On August 28, 2015, Plaintiff saw Dr. Crooks, a licensed psychiatrist, for the first time. (Doc. 35 ¶ 21; Doc. 24 at AH 0137.)  Dr. Crooks submitted an APS noting Plaintiff's diagnoses as "post-concussive syndrome" and "depression/anxiety" secondary to "a medical condition." (*Id.*)  Dr. Crooks completed a medical questionnaire in connection with Plaintiff's request for an accommodation for her job after the exhaustion of all available medical leave.  (Doc. 41 ¶ 5(h)(i); Doc. 24 at AH 0147.)  The questionnaire asked, "Are there any job functions this individual is totally unable to perform?  If so, please list them and state how long you anticipate the inability to last."  (*Id.*)  In response, Dr. Crooks wrote, "It is difficult to predict the trajectory of recovery for this pt who suffered a TBI with subsequent cognitive inefficiencies.  With medication and therapy, it is hoped she can return to work in 6-8 weeks from today."  (*Id.*)  On October 14, 2015, Dr. Crooks extended Plaintiff's expected return to work date for another "6-8 weeks."  (Doc. 35 ¶ 21; Doc. 24 at AH 0141.)

On November 17, 2015, Plaintiff was notified that she was approaching the January 10, 2016, exhaustion date for STD benefits and that her claim would be transferred to Sedgwick to determine whether she qualified for Long-Term Disability ("LTD") benefits thereafter.  (Doc. 35 ¶ 22; Doc. 24 at AH 0162.)

## B.  Long-Term Disability Benefits Claim

1.  <u>Initial Approval of LTD Benefits</u>

Upon receipt of Plaintiff's file, Sedgwick contacted Plaintiff and asked her to identify the physicians who were treating her for the condition for which she sought LTD benefits.  (Doc. 35 ¶ 23; Doc. 28 at AH 1558.)  Plaintiff explained that Dr. Pruitt took her off work for anxiety secondary to a head concussion.  (*Id.*)  She stated that she had also seen Dr. Bertelson but "doesn't see him regularly."  (*Id.*)  Finally, she stated that she was seeing Dr. Ian Crooks, a licensed psychiatrist, and "he is the dr that is handling everything now."  (*Id.*)  She described her main problem as "anxiety, panic attacks, and severe insomnia."  (*Id.*)

Therefore, Sedgwick contacted Drs. Pruitt and Crooks to obtain updated medical records. (Doc. 35 ¶ 24; AH 0219–30, AH 1544–45.)[3]  As of December 7, 2015, Dr. Crooks advised that Plaintiff was unable to work.  (Doc. 35 ¶ 25; Doc. 24 at AH 0211–13; Doc. 28 at AH 1542.) Plaintiff reported to Dr. Crooks that she was experiencing increasing frequency and severity of panic attacks due to increasing interpersonal conflict with her husband, who lived in England. (*Id.*)  Dr. Crooks noted that Plaintiff was being referred for neuropsychological testing and to a

---

[3]  There is no reference to a response from Dr. Pruitt.

therapist.  (*Id.*)  He could not determine a return to work date until after the testing and therapy.  (*Id.*)[4]

On January 19, 2016, Sedgwick Nurse Case Manager Jennifer Jansen ("NCM Jansen") spoke with the Plaintiff to determine if her neuropsychological testing had been scheduled. (Doc. 35 ¶ 26; Doc. 28 at AH 1540.)  Plaintiff advised she was waiting on insurance approval and that she was scheduled for a psychotherapist appointment with Andrea Turnipseed on January 28, 2016.  (*Id.*)

On January 19, 2016, NCM Jansen recommended initial approval of the LTD claim. (Doc. 35 ¶ 27; Doc. 28 at AH 1538.)  NCM Jansen noted, "I am recommending approval of LTD benefits through 01/31/16.  Medical indicates improvement in depression and anxiety but ongoing symptoms of panic attacks, social isolation, and anhedonia.  The associate is ending her marriage which will likely have a negative impact on her depressive symptoms as well as her anxiety.  She will begin treating with a therapist.  Neuropsychological testing is being ordered to test for any cognitive issues." (*Id.*)  That same day, Sedgwick notified Plaintiff and her then-counsel that her LTD benefits were approved as of January 11, 2016.  (Doc. 35 ¶ 28; Doc. 41 ¶ 4(d); Doc. 24 at AH 0253–55.)

From January 28, 2016 through June 2016, Plaintiff received individual therapy from Andrea Turnipseed, a licensed clinical social worker.  (Doc. 41 ¶ 5(l).)  Much of Plaintiff's counseling focused on Plaintiff's marital problems, divorce, and related family problems.  (Doc. 35 ¶ 29; Doc. 24 at AH 0262, 0269, 0271, 0273, 0299, 0378, 0382, 0386, 0388, 0411; Doc. 25 at AH 0420, 0422, 0424, 0426, 0432, 0436, 0458–60, 0471–74.)

---

[4]  Dr. Crooks continued to treat Plaintiff through the denial of her LTD claim.  (Doc. 41 ¶ 5(j).) Dr. Crooks would regularly provide responses first to the Ascension Ministry Service Center (which administered Plaintiff's claim for STD benefits) and then to Sedgwick (which administered Plaintiff's claim for LTD benefits) upon request.  (Doc. 41 ¶ 5(k).)

On February 10, 2016, Plaintiff returned to see Dr. Bertelson, the neurologist, and Dr. Bertelson submitted an APS and treatment notes from that visit. (Doc. 35 ¶ 30; Doc. 41 ¶ 5(m); Doc. 24 AH 0280–87, 0289.) During that visit, Plaintiff self-reported that she may blank out at times, leaving the water running and once leaving dinner on the stove until there was smoke in the apartment. (Doc. 41 ¶ 5(m)(i); Doc. 24 at 0287.)[5] In the APS, Dr. Bertelson opined that Plaintiff was unable to return to work from a neurological standpoint, although in response to the request for the date of Plaintiff's next office visit, he wrote there was none scheduled for this time. (Doc. 35 ¶ 30; Doc. 24 at AH 0289.) In response to the request for objective medical evidence to support disability, he wrote, "Memory impairment – nonspecific, but I strongly suspect a primary psychiatric component. A mild TBI 2 ½ years ago should not, by itself, make her intermittently deteriorate. She clearly has anxiety and describes panic attacks." (*Id.*) However, as noted in the review of symptoms, Dr. Bertelson noted Plaintiff reported "no insomnia, no headaches . . . no memory lapses . . . no mood swings, no depression, no behavior problems, and no anxiety." (Doc. 41 ¶ 5(m)(i); Doc. 24 at 0287.) Dr. Bertelson ordered an EEG to rule out seizures, stating, ". . . I doubt her spells represent seizures." (Doc. 35 ¶ 30; Doc. 24 at AH 0287.) He recommended Plaintiff proceed with a neuropsychological examination with Dr. Allison Myers-Fabian. (Doc. 41 ¶ 5(m)(v); Doc. 24 at AH 0287.)

As of March 10, 2016, Plaintiff was having complications with getting her EEG and neuropsychological evaluations completed due to a change in medical insurance. (Doc. 35 ¶ 31; Doc. 28 at AH 1506–08.) Accordingly, NCM Jansen recommended an approval of LTD benefits through May 31, 2016, to give Plaintiff time to complete the testing. (*Id.*) On April 12, 2016, Dr. Crooks, Plaintiff's psychiatrist, submitted an APS and an April 11, 2016 visit note. (Doc. 35

---

[5] Defendant maintains such self-reported incidents are legally irrelevant to the determination of Disability under the Plan. (Doc. 41 ¶ 5(m)(i).)

¶ 32; Doc. 25 at AH 0414–18.)  Dr. Crooks opined that Plaintiff was unable to return to work.  In response to a request for objective medical evidence to support ongoing disability, he wrote, "Please see progress note from today. Ongoing panic, cognitive dysfunction getting EEG and neurological testing to clarify diagnosis and guide treatment."  (Doc. 35 ¶ 32; Doc. 25 at AH 0414.)

On May 19, 2016, Dr. Allison Myers-Fabian, a Board Certified Clinical Neuropsychologist, conducted the neuropsychological evaluation to determine Plaintiff's level of neurocognitive and emotional functioning.  (Doc. 35 ¶ 34; Doc. 25 at AH 0446–49.)  Dr. Myers-Fabian administered the following thirteen tests during the evaluation:  Trial Making Test; COWA; Wechsler Test of Adult Reading; Grooved Pegboard Test (GPT); Wechsler Adult Intelligence Test Scale 4th Ed. (WAIS-IV: Selections); Wechsler Memory Scale-IV (WMS-IV: Selections); Benton Judgment of Line Orientation; Boston Naming Test-2; California Verbal Learning Test-II; Wisconsin Card Sorting Test-128; Minnesota Multiphasic Personality Inventory-2RF; Green's Word Memory Test; and Test of Memory & Malingering.  (Doc. 35 ¶ 34; Doc. 25 at AH 0446.)  In her evaluation dated June 7, 2016, she opined that the results were deemed "invalid/inconclusive due to suboptimal/disengagement across tasks."  (Doc. 35 ¶ 35; Doc. 25 at AH 0446.) (emphasis in original)  She explained:

> The patient failed multiple neuropsychological measures that also doubled as performance validity or "effort" measures. That is, she performed worse than individuals with dementia or severe traumatic brain injury and at times matched a population asked to fake impairment or that have an underlying psychiatric disorder. Furthermore, her performance was inconsistent with known patterns of brain function of individuals with a history of concussion. Overall, there appears there was an effort to draw attention to and overstate degree of distress and impairment.

(*Id.*)  Dr. Myers-Fabian also discussed Plaintiff's completion of the MMPI-2/RF emotional/behavioral assessment and again questioned the validity of the Plaintiff's test, stating:

> Validity scales indicated an unusual combination of response that may be associated with non-credible reporting of somatic/cognitive symptoms, specifically memory complaints. Overall, it is likely that she overstated her degree of distress and impairment due to significant emotional distress.

(Doc. 35 ¶ 36; Doc. 25 at AH 0446.)  After Dr. Myers-Fabian questioned the validity of the emotional/behavioral assessment, she went on to note in that same section that based on Plaintiff's self-reports, "she may be prone to developing physical symptoms in response to stress and may have a psychological component to her somatic complaints.  At this time, the patient meets criteria for major depressive disorder, recurrent, moderate as well as moderate somatic symptom disorder."  (Doc. 41 ¶ 6(b); Doc. 25 at AH 0446.)  Dr. Myers-Fabian recommended re-testing in six months.  (Doc. 35 ¶ 36; Doc. 25 at AH 0447.)  She stated that doing another evaluation prior to that time would make that test invalid due to exposure to the testing materials.  (Doc. 25 at AH 0480.)

Plaintiff, however, did not return to Dr. Myers-Fabian for this testing.[6]  In a subsequent visit with Dr. Crooks on June 9, 2016, Dr. Crooks noted Plaintiff subjectively reported that she was "upset with poor testing conditions" of this "inconclusive" neuropsychological testing, which resulted in a "suboptimal benefit."  (Doc. 35 ¶ 39; Doc. 25 at AH 0452.)  She expressed her frustration and disappointment with the process and results from Dr. Myers-Fabian's testing, indicating her failure to eat breakfast before the testing and her medication impacted her ability to respond.  (Doc. 25 at AH 0452.)

As of June 8, 2016, NCM Jansen recommended approving continuation of benefits through June 30, 2016.  She noted that the "Neuropsychological exam indicated results were inconclusive/invalid due to suboptimal effort/disengagement for a cognitive disorder.  However,

---

[6]  Dr. Myers-Fabian subsequently issued an addendum to her report.  That addendum is discussed *infra*.

the neuropsychological testing did confirm that the associate met the criteria for major depressive disorder recurrent/moderate as well as a moderate somatic symptom disorder." (Doc. 35 ¶ 37; Doc. 28 at AH 1474.) As a result, benefits were extended through June 30, 2016. (Doc. 35 ¶ 37; Doc. 28 at AH 1473.)

Dr. Crooks submitted an APS to Sedgwick on June 9, 2016, relating to Plaintiff's LTD benefits claim in which he opined that she could not return to work from a psychiatric standpoint. (Doc. 35 ¶ 38; Doc. 24 at AH 450.) In response to a request for objective medical evidence to support ongoing disability, he wrote, "Ongoing panic attacks, depression, cognitive impairment, poor function. Pt. actively engaged in process of treating psychiatric symptoms." (*Id.*) However, in the office note from Plaintiff's June 9, 2016 visit, Dr. Crooks indicated that the employee's Global Assessment of Functioning ("GAF") was 70, which represented a fairly high-level of functioning. (Doc. 35 ¶ 39; Doc. 25 at AH 0452–53.) Dr. Crooks also noted that the Plaintiff was "clean, careful makeup and nicely dressed, good eye contact, cooperative, anxious appearing, polite." (*Id.*) Under a long list of "subjective" complaints, he noted that Plaintiff reported "panic attacks," among other things. (*Id.*)

On June 10, 2016, after reviewing the June 9 APS and Office Note submitted by Dr. Crooks, Sedgwick Nurse Case Manager Margie Vargo ("NCM Vargo") observed that Dr. Crooks's records were contradictory; that Plaintiff's neuropsychological examination was inconclusive and that Dr. Myers-Fabian opined that she may be exaggerating symptoms; and that the May 24, 2016, EEG test results were still outstanding. (Doc. 35 ¶ 40; Doc. 28 at 1470.) NCM Vargo suggested that they continue to maintain contact with the Plaintiff and her physicians to assess treatment and progress toward return to work. (*Id.*) She further suggested

that that they consider a physician advisor review to evaluate Plaintiff's treatment and ability to return to work. (*Id.*)

After requesting Plaintiff's EEG results at least two times, Sedgwick finally received them on July 5, 2016, and the results were normal. (Doc. 35 ¶ 41; Doc. 25 at AH 0475–77; Doc. 28 at AH 1464.) That same day, Dr. Myers-Fabian issued an addendum to Plaintiff's neuropsychological evaluation to address Plaintiff's explanation regarding the inconclusive neuropsychological testing results. (Doc. 35 ¶ 42; Doc. 25 at AH 0479–82.) Specifically, Plaintiff advised Dr. Myers-Fabian that she did not eat on the day of testing, was under the influence of medication, and was not properly prepared for what to expect prior to the evaluation. (*Id.*) Dr. Myers-Fabian reiterated the importance of re-testing in six months, but her impressions remained the same. (*Id.*) The same day, NCM Jansen recommended extending the approval of Plaintiff's LTD benefits through July 31, 2016, to allow an independent licensed psychiatrist to review Plaintiff's complete medical file and test results. (Doc. 35 ¶ 43; Doc. 25 at AH 0484; Doc. 28 at AH 1454.) On July 11, 2016, Sedgwick informed Plaintiff of her new benefit amount as an offset for her auto accident. (Doc. 35 ¶ 42 n.3; Doc. 25 AH 0486.)

2. Initial Denial of LTD Benefits

On July 5, 2016, Sedgwick notified Dr. Crooks, Plaintiff's psychiatrist, that it was referring Plaintiff's case for an independent psychiatric review and informed him that the reviewer would contact him for a peer-to-peer discussion. (Doc. 35 ¶ 44; Doc. 25 at AH 0484.)

The first board-certified advisor retained by a third-party medical review company to review Plaintiff's file was Marcus Goldman, M.D., a Board Certified Psychiatrist. He conducted an independent review of Plaintiff's complete medical file and test results. (Doc. 35 ¶ 45; AH 0492–94.) As part of his review, Dr. Goldman attempted to contact Dr. Crooks, Plaintiff's

psychiatrist, on two separate occasions and left messages both times, but Dr. Crooks never returned his calls. (*Id.*) In his report dated July 12, 2016, Dr. Goldman concluded that Plaintiff was not Disabled from performing her Own Occupation as of June 30, 2016, forward. (*See id.*)

Dr. Goldman's report provided the following detailed explanation of his reasoning:

> Based on the information available for review, as described above, it is the reviewer's opinion within reasonable medical probability that the clinical evidence does not support functional impairment from 6/30/16 going forward. A page-by-page review of this record reveals documentation supporting largely self-reported complaints with no evidence of a functionally impairing mental disorder. Documentation from Dr. Crooks reveals self-reported complaints of panic disorder with no overt evidence of debilitating anxiety. Progress notes from Therapist Turnipseed likewise reveal unspecified degrees of anxiety with no evidence of impaired processing, overt evidence of disability anxiety, distractibility, inattentiveness, overt vegetative signs, or measured cognitive dysfunction. Data do not detail how the claimant's presentation and self-report would have grossly affected her capacity to function. There is no evidence that this claimant is incapable of managing activities or independent activities of daily living, and neuropsychological testing was deemed to be of questionable validity. It is noted that the interpretation of raw data would be beyond my expertise. Nevertheless, the claimant is not actively suicidal, homicidal, disorganized, and has not required transition to a more intense level of care reflective of severity. While panic disorder and depression clearly can be impairing, documentation in this record does not adequately detail the presence of a mental disorder of such severity as to be impairing. This reviewer would respectfully disagree with Dr. Crooks that the Claimant is impaired due to anxiety and depression.

(*Id.*)

NCM Jansen reviewed Dr. Goldman's July 12, 2016, report and all other medical in Plaintiff's file. (Doc. 35 ¶ 47; Doc. 25 at AH 0547; Doc. 28 at AH 1448.) Considering the inconclusive neuropsychological evaluation from Dr. Myers-Fabian, the normal EEG, Dr. Crooks's GAF of 70 which is "indicative of mild symptoms," and Dr. Goldman's assessment, she concluded that Plaintiff was not disabled from performing her Own Occupation and recommended that Plaintiff's claim for ongoing benefits be denied. (*Id.*) On July 15, 2016, Sedgwick sent Plaintiff a letter notifying her that as of July 31, 2016, Plaintiff no longer qualified

for LTD benefits, because she no longer met the definition of Disability. (Doc. 35 ¶ 48; Doc. 41 ¶ (4)(f); Doc. 25 at AH 0546–52.) Sedgwick included an appeal packet with the letter. (*Id*.)

### 3. Appeal of LTD Decision & Additional Evidence Submitted

Plaintiff initiated an administrative appeal on January 10, 2017, via a letter from Attorney Lloyd E. Bemis. (Doc. 35 ¶ 49; 41 ¶ 4(h); Doc. 26 at AH 0763–69.) In that letter, Plaintiff asserted for the first time that she suffered from a permanent disability associated with "early onset Alzheimer's disease." (Doc. 35 ¶ 49; Doc. 26 at AH 0763–69.) She asserted that the "anxiety, panic attacks, insomnia, and memory issues were early signs of the disease." (*Id.*)

#### a. *Plaintiff's Additional Evidence*

In connection with the appeal, Plaintiff submitted supplemental evidence on January 17, 2017. (Doc. 35 ¶ 50; Doc. 26 at AH 0763–0915.) Two of the six attachments, namely the EEG test results and the addendum to Dr. Myers-Fabian's psychological evaluation, were already contained in Plaintiff's claims file. (Doc. 35 ¶ 50.) The new attachments are discussed below.

First, Plaintiff submitted a copy of her Social Security Administration ("SSA") Disability determination, which found her disabled under the SSA's gainful activity standard. (Doc. 35 ¶ 51; Doc. 26 at AH 0794–0838.) Plaintiff applied for SSDI benefits in February 2016 and was granted benefits in September 2016, with an onset date of July 15, 2016. (Doc. 41 ¶¶ 6(f), (f)(i); Doc. 26 at AH 0808.)[7] Joel Forgus, Ph.D., at the request of SSA, issued a report regarding Plaintiff's medically determinable mental impairments and severity and residual functional capacity based on his review of records in connection with Plaintiff's SSDI claim. (Doc. 26 at AH 801–808.) An assessment of vocational factors was also part of the SSA determination.

---

[7] Defendant admits Plaintiff was determined to be disabled pursuant to the SSA standard but maintains that this determination has no legal bearing on Plaintiff's eligibility for benefits under the LTD Plan. (Doc. 41 ¶ (f)(i).)

Second, Plaintiff submitted a letter dated June 9, 2016, from Dr. Crooks to Attorney Bemis regarding Plaintiff's disability and a functional assessment. (Doc. 35 ¶ 52; Doc. 26 at AH 0847–56.) In Dr. Crooks's June 9, 2016 letter, he discussed Plaintiff's medical records and acknowledged both the invalid/inconclusive test result of her neuropsychological evaluation and her normal EEG. (Doc. 35 ¶ 52; Doc. 26 at AH 0848–49.) However, he ultimately concluded that he was "willing" to support Plaintiff in her request for SSDI. (*Id.*) In connection with Dr. Crooks's support of Plaintiff's SSDI claim, he completed a Physician Statement and Functional Assessment. (AH 0850–56.) In response to a SSA question regarding Plaintiff's ability to work, Dr. Crooks stated, "She is unable to work due to persistent anxiety, episodic panic attacks and reports of memory problems and cognitive inefficiency." (Doc. 35 ¶ 52; Doc. 41 ¶ 6(d)(i); Doc. 26 at AH 0851.) Under a definition specific to Social Security, Dr. Crooks stated that if she attempted to work, she would be off task for more than 15% of the time. (Doc. 41 ¶ 6(d)(ii); Doc. 26 at AH 0852.) In that Social Security Assessment, Dr. Crooks also provided conclusions regarding Plaintiff's ability to complete tasks in a timely manner and other work limitations due to her psychiatric state. (Doc. 41 ¶ 6(d)(iii)–(iv); Doc. 26 at 0854.) Dr. Crooks ultimately concluded that Plaintiff's duration of disability was "difficult to assess" and that he was hopeful she would "once again be able to work in a meaningful way." (Doc. 35 ¶ 52; Doc. 26 at AH 0851.)

Third, Plaintiff submitted a neuropsychological evaluation report of Dr. Eric Frey, Ph.D., a licensed psychologist who evaluated Plaintiff at the request of Dr. Crooks on August 11, 2016, and August 29, 2016, as a follow up to the neuropsychological testing Dr. Myers-Fabian. (Doc. 26 at AH 0857–65, AH 0446.) However, as mentioned above, Dr. Myers-Fabian had recommended such re-testing not be done until six months from May 19, 2016 (no earlier than

November 19, 2016), as doing another evaluation prior to that would invalidate the test. (Doc. 25 at AH 0447, 0480.) Dr. Frey administered the following tests as a part of his evaluation: Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV); Wechsler Memory Scale—Fourth Edition (WMS-IV); Conners Continuous Performance Test II; Trial Making Tests A & B; and Personality Assessment Inventory (PAI). (Doc. 26 at AH 0858.) Dr. Frey summarized his findings in a report dated September 15, 2016, as follows:

> Ms. Anyanwu demonstrated mild problems with short-term memory, visual-spatial reasoning, and information processing speed. She demonstrated rather severe deficits in her memory for orally-presented information, significant deficits in her ability to sustain attention to tasks, and moderate problems adjusting to changing task demands. Her verbal comprehension and expression abilities remain intact. Additionally, her memory for visually-presented material is in the average range.

> This pattern of scores is somewhat similar to that displayed by individuals who have suffered a traumatic brain injury, although her memory deficits are more severe than usually seen with TBI alone. Results are also similar to individuals with dementia, who display memory problems, slowed information processing speed, and executive function difficulties (e.g. problems with attention, decision-making, working memory). She is experiencing continued depression symptoms and frequent anxiety, which probably impacted some test results negatively. Nevertheless, the impairments reported and displayed during this evaluation are significantly greater than those obtained by samples of individuals with depression or anxiety alone. Her difficulties appear to reflect a decline in functioning, given her previous level of education and employment. Finally, Ms. Anyanwu reported significant family history of dementia. Consequently, a diagnosis of possible major neurocognitive disorder (dementia) appears appropriate.

> The etiology of Ms. Anyanwu's cognitive difficulties is unclear. Neurocognitive problems related to traumatic brain injury (i.e. concussion in 2013) is possible, since her symptoms became most apparent after that incident. But her impairments are more severe than expected with a single concussion. Her family history and the prominence of memory problems over language and visual-spatial problems suggest an early presentation of Alzheimer's dementia.

> While somatic disorder cannot be ruled out, the consistency of Ms. Anyanwu's cognitivetesting scores and behavioral observations during testing support her reports of memory and executive function problems.

(Doc. 35 ¶ 53; Doc. 26 at AH 0860, 0863–65.)  However, Dr. Frey did not perform any validity testing.  (Doc. 26 at AH 0858; *see also* Doc. 26 at AH 0924.)

Fourth, Plaintiff submitted medical records concerning Plaintiff's thyroid condition. (Doc. 35 ¶ 54; Doc. 41 ¶ 6(g); Doc. 26 at AH 0866-0915.)  The treatment started at the end of July 2016 and continued until December 2016.  (*Id.*)  The notes include Plaintiff's November 2016 thyroidectomy and test results reflecting that all cysts were benign.  (*Id.* at AH 0886, 0890–93.)

### b.  Reports from Independent Specialists

On January 26, 2017, Sedgwick referred Plaintiff's claims file for review by multiple independent, board-certified medical advisors, in addition to Dr. Goldman, the board-certified psychiatrist who had reviewed Plaintiff's records during the initial LTD denial phase.  (Doc. 35 ¶ 55, Doc. 28 at AH 1426–29.)  Sedgwick requested specializations in Gastroenterology/Internal Medicine and Neuropsychology.  (*Id*.)

Dr. Elana Mendelssohn, Psy.D., Board Certified in Neuro-Psychology, was the second outside advisor retained on behalf of Sedgwick to review Plaintiff's file.  (Doc. 35 ¶ 56; Doc. 26 at AH 0922–30.)  Specifically, she reviewed Plaintiff's functionality from a neuro-psychology perspective as of mid-August 2016 in light of Dr. Frey's report, which assessed Plaintiff's functionality as of the same time period.  (*Id*.)  In connection with her review of Plaintiff's condition, Dr. Mendelssohn conducted a peer-to-peer call with both Dr. Myers-Fabian and Dr. Frey.  (Doc. 35 ¶ 57; AH 0923–24.)  Despite contacting Dr. Crooks's office and Dr. Bertelson's office three times each via phone and fax and leaving detailed information, Dr. Mendelssohn received no response from them.  (Doc. 35 ¶ 57; AH 0923–24, 1415–18.)

In Dr. Mendelssohn's peer-to-peer review with Dr. Myers-Fabian, they discussed Dr. Myers-Fabian's invalid findings in her evaluation of Plaintiff. (Doc. 35 ¶ 58; Doc. 26 at AH 0924.) Dr. Myers-Fabian added nothing beyond her report. (*Id.*) Dr. Myers-Fabian did mention that Plaintiff contacted her several times after the results because she was upset by her conclusions. (*Id.*) Dr. Mendelssohn then summarized her call with Dr. Frey as follows:

> In my peer-to-peer discussion with Dr. Frey, I asked him whether he administered any symptom validity measures in his evaluation particularly given the previous evaluation completed by Dr. Myers-Fabian. However, Dr. Frey stated he did not complete formal test of validity but that by his observation she was applying effort. I pointed out to him her inconsistent responding on the self-report inventory. He stated that this was not due to lack of effort but inconsistency, which may have been due to attention and concentration problems. I pointed out his diagnoses related to neurocognitive disorder deficits and the possible causes. He stated that he was uncertain as to the actual cause of her cognitive deficits given that he was unaware of her full neurological background. I asked Dr. Frey if he provided treatment to the claimant giving the recommendation for ongoing mental health treatment. He stated that he had not provided treatment.

(Doc. 35 ¶ 59; Doc. 26 at AH 0924.)

After conducting the peer-to-peer reviews and reviewing Plaintiff's claims file, Dr. Mendelssohn concluded that Plaintiff was not Disabled or functionally impaired from her Own Occupation as of August 2016. (Doc. 35 ¶ 60; Doc. 26 at AH 0927.) She explained that Plaintiff's medical facts and claim documentation did not support that Plaintiff was functionally impaired from her occupation, stating that "despite reports of ongoing cognitive disturbance, documentation from the claimant's treating providers did not include specific examination findings indicative of cognitive dysfunction." (Doc. 35 ¶ 60; Doc. 26 at AH 0927, 0929.) For example, she concluded Plaintiff's providers primarily documented the claimant's self-reported and inconsistent symptoms as well as her reports of depressed and anxious mood and affect instead of a description of direct observed behaviors to corroborate impairment. (Doc. 26 at AH 0928.) Dr. Mendelssohn further questioned the validity of Dr. Frey's neuropsychological

evaluation, which the SSA determination seemed to rely upon heavily to the exclusion of Dr. Myers-Fabian's report. (Doc. 35 ¶ 60l Doc. 26 at AH 0928.) Specifically, she stated, "Although Dr. Frey reviewed the previous neuropsychological evaluation which reflected suboptimal effort, he did not administer any type of symptom validity measures to ensure valid data. As such, his conclusion as the presence of cognitive deficits possibly due to traumatic brain injury or Alzheimer's disease would be questionable given that there was no indication that he obtained valid data." (Doc. 35 ¶ 60; Doc. 26 at AH 0928.) She questioned how Dr. Frey concluded Plaintiff had a diagnosis of major depressive disorder in light of the presence of symptom exaggeration. (Doc. 26 at AH 0928.)

Venkat Mohan, M.D., Board Certified in Gastroenterology and Skilled in Internal Medicine, the third outside advisor retained on behalf of Sedgwick, completed an independent review on February 7, 2017. (Doc. 35 ¶ 61; Doc. 26 at AH 0935–40.) In connection with his review, Dr. Mohan attempted to contact Plaintiff's treating gastroenterology physicians, Dr. Vijayrana Poreddy and Dr. Steven Fyfe, via facsimile and telephone. (Doc. 35 ¶ 61; Doc. 26 at AH 0936.) Dr. Poreddy refused to perform a peer-to-peer discussion, and Dr. Fyfe was unreachable in spite of three calls to his office. (Doc. 35 ¶ 62; AH 1414, 1424). Dr. Mohan concluded Plaintiff was not disabled from an Internal Medicine or Gastroenterology standpoint as of August 2016. (Doc. 35 ¶ 63; Doc. 26 at AH 0939.) Dr. Mohan explained that Plaintiff's November 28, 2016, thyroidectomy left her impaired from November 28, 2016, through December 5, 2016, only. (Doc. 26 at AH 0938). When asked whether Plaintiff's SSA award changed his opinion, Dr. Mohan submitted an addendum on February 19, 2017. (Doc. 35 ¶ 64; Doc. 26 at AH 0951–57.) Dr. Mohan reaffirmed his original opinion, explaining that "[t]he

social security claim was not based on her liver function abnormalities, nor does it provide clinical findings that were impairing the claimant during the review period." (*Id.*)

Kristin Egan, M.D., Board Certified in Otolaryngology, the fourth outside medical advisor retained on behalf of Sedgwick, completed an independent review from an Otolaryngology perspective on February 20, 2017. (Doc. 35 ¶ 65; Doc. 26 at AH 0962–69.) After conducting a peer-to-peer call with Dr. Fyfe, who performed Plaintiff's thyroidectomy and confirmed he supported Plaintiff's leave during the short period when she was recovering from surgery, Dr. Egan concluded that Plaintiff was "not functionally impaired from unrestricted job duties from 8/1/16 through RTW, with the exception of 11/28/16 through 12/12/16." (Doc. 35 ¶¶ 66, 67; Doc. 26 at AH 0964, 0967.)

On February 23, 2017, Sedgwick contacted Plaintiff's attorney's office and requested and obtained an agreement that the appeal be tolled for forty-five days in order to allow for Plaintiff's participation in an Independent Medical Evaluation ("IME") to determine and define Plaintiff's overall functionality. (Doc. 35 ¶ 68; Doc. 26 at AH 0974, 0990; Doc. 28 at AH 1404.) On March 10, 2017, Network Medical Review Co. Ltd., a third-party company, informed Plaintiff's counsel that Sedgwick scheduled an IME for Plaintiff with William Holden, Ph.D., a licensed Neuropsychologist, for March 23, 2017 at 9:00 a.m. and fully explained the process. (Doc. 35 ¶ 69; Doc. 26 at AH 0985.) Dr. Holden was the fifth outside medical advisor retained on behalf of Sedgwick to evaluate Plaintiff's claim.

On April 6, 2017, Dr. Holden provided a written Independent Neuropsychology Evaluation reflecting his March 23, 2017, assessment. (Doc. 35 ¶ 70; Doc. 26 at AH 0989–96.) Dr. Holden administered the following fifteen tests as a part of his evaluation: Green's Word Memory Test; Tests of Memory Malingering IV; Wechsler Adult Intelligence Scale (WIAT-IV);

Wechsler Memory Scale (DMS): Logical Memory I, II and Recognition; ReyOstrich Complex Figure Test; California Verbal Learning Test – II Edition; Wide Range Achievement Test IV: Word Reading Subtest; Cognistat (Neurobehavioral Cognitive Status Exam): Selected Subtest; Short Category Test, Stroop Color and Word Test; Controlled Oral Word Association Test; Trails Making Test A and B; Finger Tapping Test; Strength of Grip; Grooved Pegboard; Minnesota Multiphasic Personality Inventory-2-Restructed Form (MMPI-2- RF). (Doc. 35 ¶ 71; Doc. 26 at AH 0991.)

In summarizing his findings, Dr. Holden explained that the word memory tests measured symptom validity. (Doc. 35 ¶ 72; Doc. 26 at AH 0992.) In these tests, Plaintiff "obtained failing scores on 2 of the 3 easy tests." (*Id.*) Plaintiff's "[c]onsistency of responding was at a low level," and her "[i]mmediate recognition recall was actually lower than delayed recognition recall, which is not to be expected." (*Id.*) Plaintiff "scored in the bottom 5% whereas 95% of individuals obtained perfect scores" on an easy forced choice recognition test. (*Id.*) He noted these findings were consistent with findings from Plaintiff's May 19, 2016, neuropsychological evaluation performed by Dr. Myers-Fabian. (*Id.*) Therefore, he concluded that "any interpretation of cognitive test results should be approached with caution and be questionable as to a true ability." (*Id.*) Similarly, Dr. Holden noted that "[t]he MMPI-2-RF also raised questions about the validity of the results. The claimant generated a large number of infrequent responses to MMPI-2-RF items. This level of responding to infrequently endorsed items may occur in persons with genuine psychological difficulties." (Doc. 35 ¶ 73; Doc. 26 at AH 0992.)

Dr. Holden ultimately diagnosed Plaintiff with "major depressive disorder, recurrent, moderate," "somatic symptoms disorder, moderate," and "panic disorder." (Doc. 26 at AH 0991.) However, despite this diagnosis, when asked to provide an opinion regarding whether

Plaintiff was functionally limited or Disabled as of August 1, 2016, he determined that "[e]xam findings from this neuropsychological evaluation did not conclusively support functional impairment and raise questions about the validity of the results." (Doc. 35 ¶ 74; Doc. 26 at AH 0993.) Dr. Holden also strongly disagreed with Dr. Frey's findings, because "he did not utilize symptom validity measures to address validity of results" and relied too heavily on particular records that provided no objective findings. (Doc. 35 ¶ 75; Doc. 26 at AH 0994.) This disagreement also made Dr. Holden question Plaintiff's SSA disability determination, which he thought could create a self-fulfilling prophecy of helplessness and was not supported due to Plaintiff's over-reporting of infrequently occurring symptoms. (Doc. 35 ¶ 75; Doc. 26 at AH 0993, 0995.) He further opined that Plaintiff might be motivated by avoiding returning to a stressful work environment, obtaining financial gains, and enjoying more leisure time, thus resulting in her exhibiting illness-related behavior. (Doc. 26 at AH 0995.) Therefore, although Dr. Holden agreed Plaintiff had a long history of documented emotional difficulties, he concluded that they did not rise to the level of a functional impairment based on his independent medical examination. (*Id*. at AH 0993–94.) He recommended Plaintiff gradually return to work full time. (*Id*.)

On April 7, 2017, Sedgwick informed Plaintiff that a 45-day extension was needed in order to make a determination on her appeal. (Doc. 35 ¶ 76; Doc. 26 at AH 0998.)

Sedgwick thereafter requested that a panel of three neuropsychologists further review Plaintiff's claim and discuss Plaintiff's claim with her treating physicians and with Dr. Frey. (Doc. 35 ¶ 77; Doc. 26 at AH 1007–11, 1017–20, 1029–40.) The three-member panel, consisting of the sixth, seventh, and eighth outside specialists to review Plaintiff's claim, was comprised of Eric Rinehardt, Ph.D., Richard DeBenedetto, Ph.D., and Robert Collins, Ph.D., all

of whom are Board Certified in Neuro-Psychology. (*Id.*) These board-certified physicians were asked to review Plaintiff's functionality as of August 2016. (*Id.*) Drs. Rinehardt, DeBenedetto, and Collins determined that there was no objective medical evidence of Disability from Plaintiff's Own Occupation as of August 2016. (Doc. 35 ¶ 78.)

In his report, Dr. Rinehardt noted the following:

> There is insufficient clinical evidence to support cognitive dysfunction from a concussion (mild traumatic brain injury) or a neurodegenerative disease (Alzheimer's disease). There is also insufficient clinical evidence to support her psychological symptoms. Therefore, from a neuropsychology perspective, the provided medical records do not support the presence of functionally impairing symptoms from 8/16/16 through return to work.

(Doc. 35 ¶ 79; Doc. 26 at AH 1010.) Similarly, Dr. DeBenedetto found that Plaintiff was not Disabled stating:

> From a neuropsychological perspective, the provided medical records do not support the presence of functionally impaired symptoms from 8/16/16 through return to work.
>
> With respect to the claimant's neurocognitive status from 8/16/16 though return to work, her repeated failure of all stand-alone validity measures as well as most embedded measures of response-validity across multiple neuropsychological evaluations does not allow for a clinically meaningful or valid interpretation of the cognitive deficits evidenced across these evaluations.
>
> The information provided in the IME report supports my previous statements. There has been evidence of invalid responding on the conducted neurological evaluation that is available for my review.
>
> What is clinically reasonable to assert based on empirical research and clinical experience with traumatic brain injury is the fact that it is highly unlikely that any neurocognitive deficits and the reported progressive decline in neurocognitive functioning some two years or more post motor vehicle accident reported are related to any presumed brain trauma sustained during that event. Therefore from a neuropsychological perspective, the provided medical records do not support the presence of functionally impairing symptoms from 8/16/16 through return to work.

(Doc. 35 ¶ 80; Doc. 26 at AH 1020.)

Dr. Collins attempted to contact Plaintiff's treating physicians and examiners before providing his opinion. (Doc. 35 ¶ 81; Doc. 26 at AH 1030–31.) Specifically, Dr. Collins attempted to contact Dr. Crooks five (5) separate times by telephone and facsimile without success. (*Id.*) Similarly, Dr. Collins tried to reach Dr. Bertelson on seven (7) separate occasions, but was unable to reach him. (*Id.*) Dr. Collins spoke with Dr. Myers-Fabian on April 24, 2017, who had no comment with regard to Plaintiff's cognitive impairment as of August 8, 2016, given the suboptimal effort findings during her examination. (Doc. 35 ¶ 82; Doc. 26 at AH 1031–32.) On April 28, 2016, Dr. Collins also spoke with Dr. Frey, who indicated that he thought Plaintiff would be functionally impaired to a degree that would interfere with her ability to work, citing Plaintiff's slight impairments and processing speed, difficulty with multistep problems, and difficulty with short-term memory and attention. (Doc. 35 ¶ 83; Doc. 26 at AH 1032.) While Dr. Frey stated that he did not use validity performance measures, it was his clinical opinion that Plaintiff put forth good effort. (*Id.*) He also acknowledged that Plaintiff's responses on the Personality Assessment Inventory were not interpretable, but he blamed Plaintiff's response inconsistencies on carelessness, instead of symptom over exaggeration. (*Id.*)

After speaking with Plaintiff's treating physicians and assessing the totality of Plaintiff's claims file, Dr. Collins, like Drs. Rinehardt and DeBenedetto, concluded "the provided medical records and conversation with treating physicians do not support the presence of functionally impairing symptoms. (Doc. 35 ¶ 84; Doc. 26 at AH 1034, 1038.) Specifically, Dr. Collins stated:

> From a neuropsychology and cumulative perspective, the provided medical records and conversation with treating providers do not support the presence of functionally impairing symptoms from 8/16/16 through return to work. In addition the unlikely persistence of cognitive symptoms following the motor vehicle accident in 2013 the treating providers have expressed concern regarding possible psychogenic component to the claimant's perceived symptoms. More

importantly, however, during the evaluations with two neuropsychologists (Drs. Myers-Fabian and Holden) the claimant was noted to fail validity measures specifically designed to detect suboptimal effort.

(Doc. 35 ¶ 79; Doc. 26 at AH 1038.)

Sedgwick upheld the adverse LTD benefit determination on appeal on May 19, 2017. (Doc. 41 ¶ 4(i).) In a detailed letter, Sedgwick notified Plaintiff that it decided to uphold the denial of her LTD claim, with the exception of the period of November 28, 2016, through December 12, 2016, relating to her thyroid surgery and recovery. (Doc. 35 ¶ 86; Doc. 26 at AH 1047–52.) The letter first noted the appeals unit reviewed medical records from Plaintiff's multiple treaters and examiners as well as opinions in Plaintiff's Social Security disability application. (Doc. 26 at AH 1048–49.) Next, the letter discussed Dr. Egan's and Dr. Mohan's explanation of Plaintiff's impairment after her thyroidectomy and why those opinions supported Plaintiff's limited time of impairment. (Doc. 35 ¶ 87; Doc. 26 at AH 1049.) The letter also discussed Dr. Holden's IME, which did not conclusively support functional limitation and raised questions about the validity of the results. (Doc. 26 at AH 1050.) The letter then discussed the neuropsychological opinions provided by Drs. Mendelssohn, Rinehardt, DeBendetto, and Collins at length and summarized why they agreed Plaintiff was not functionally impaired beyond August 16, 2016, including Plaintiff's documented failures of validity measures and insufficient clinical evidence. (Doc. 35 ¶ 88; Doc. 26 at AH 1049–50.) The letter also discussed the opinions of Drs. Myers-Fabian and Frey, both of whom evaluated Plaintiff at her treaters' requests, and peer-to-peer communications the specialists had with those individuals. (Doc. 26 at 1049–51.) Sedgwick ultimately concluded, "Based on the totality of the medical record as well as the conversation with her treating providers, the record does not support the presence of functionally impairing symptoms from August 16, 2016 and ongoing," followed by additional

explanation, including that it was unlikely that there was persistent cognitive symptoms following Plaintiff's motor vehicle accident in 2013. (*Id*. at AH 1051.) Sedgwick then explained, "More importantly however, during evaluations with two neuropsychologists (Drs. Myers-Fabian and Holden) indicated that your client was noted to fail validity measures specifically designed to detect suboptimal effort. . . . ." (*Id*.) Sedgwick then explained why it discounted Dr. Frey's opinion. (*Id*.) In so concluding, the letter noted the appeals unit also considered Plaintiff's SSA determination, but stated that the SSA applies a different definition of disability and provides special deference to treating physicians that is not provided under the terms of the Plan, and the Plan also takes into account other factors. (Doc. 35 ¶ 89; Doc. 26 at AH 1052.) The letter advised Plaintiff that the denial was final and binding, that she would be provided reasonable access and copies of all documents relevant to her claim, and that she had six (6) months from the date of this decision to pursue legal action. (Doc. 35 ¶ 90; Doc. 26 at AH 1052.)

4.  Post-Appeal Decision to Uphold Denial of LTD Benefits

    a.  *Plaintiff's Additional Evidence*

Plaintiff submitted additional medical records on November 6, 2017, and requested that Sedgwick consider those documents or threatened that a lawsuit would be filed in two weeks. (Doc. 1 ¶ 6; Doc. 35 ¶ 91; Doc. 27 at AH 1291–1397.) The letter explained that Plaintiff had undergone high-resolution, brain Quantitative Single Photon Emission Computer Tomograpy ("SPECT") imaging on October 23, 2017, at the request of Dr. Crooks, Plaintiff's psychiatrist. (Doc. 41 ¶ 7(b)). Plaintiff asserted the SPECT imaging documented focal areas of abnormal cortical hypoperfusion in the frontal, temporal, occipital, and cerebellar areas of her brain. (Doc. 35 ¶ 92; Doc. 41 ¶ 7(b), (b)(i); Doc. 27 at AH 1291–1397.) Plaintiff stated that the imaging also

showed subcortical hypoperfusion in the brainstem and basal ganglia areas of her brain. (*Id.*) Plaintiff argued that the results were consistent with traumatic brain injury and Plaintiff's clinical history. (*Id.*) Plaintiff also submitted a medical journal article discussing such scans entitled *SPECT Imaging in Complex Psychiatric Cases: An Evidence-Based, Underutilized Tool*. (Doc. 41 ¶ 7(a); Doc. 27 at AH 1292.)

Just a few days before the SPECT imaging, a neuropsychiatric interview and cognitive assessment were administered to Plaintiff in connection with the imaging. (Doc. 27 at AH 1295.) Based on the "eMini interview," the SPECT report noted that Plaintiff met the diagnostic criteria for major depressive disorder and generalized anxiety disorder. (*Id.*) As also noted in the SPECT report, the cognitive assessment measured a variety of cognitive domains, including memory, focus, attention, information processing, and executive function. (*Id.*) That assessment generated varied results, with three scores in the low range, three scores in the low average range, and seven scores in the average range, with two of those being toward the high average end. (*Id.*)

The October 23, 2017, SPECT imaging included a radiologic impression which indicated the "nature, location, and pattern of these abnormalities is primarily consistent with the scientific literature pertaining to traumatic brain injury (TBI) and the patient's clinical history, as obtained, which was received after the blind review. Close correlation with the patient's entire medical history is advised." (Doc. 27 at AH 1294–95.) The report did not note what medical records, if any, were reviewed. (*See id*. at 1294–1300.) Instead, the clinical history as noted in the SPECT report seems to have been obtained only from Plaintiff's self-reports of her medical history and symptoms. (*See* Doc. 27 at AH 1296–98.) The radiological investigational impressions section of the SPECT report noted that some of the SPECT findings, along with Plaintiff's interview and

reported clinical history, had been associated by several authors with mood disorders or various anxiety disorders.  (Doc. 27 at AH 1295.)  The report cautioned "Close correlation with the patient's entire clinical history is advised" for those investigational impressions.  (*Id.*)  The report concluded with the following additional limiting note:

> Although there is a very large body of peer-reviewed scientific articles showing certain brain patterns associated with certain psychiatric conditions, the utilization of SPECT for the evaluation of psychiatric disorders is still considered an emerging science and therefore is in the investigational stage. . . . [S]uch findings are not considered stand alone or diagnostic per se and should always be considered in conjunction with the patient's clinical condition.  The data should only be used as additional information to add to the clinician's diagnostic impression.

(Doc. 27 at AH 1300.)

### b.  Additional Independent Physician Advisor Reviews

On November 10, 2017, Sedgwick informed Plaintiff that the additional medical documents would be considered.  (Doc. 35 ¶ 93; Doc. 27 at AH 1362.)  Two doctors reviewed the newly submitted evidence.

On November 15, 2017, Vaughn Cohan, M.D., Board Certified in Neurology and the ninth outside advisor to review Plaintiff's claim, submitted an independent medical review based on Dr. Collins's independent review from May 5, 2017, and the documents Plaintiff submitted on November 6, 2017.  (Doc. 35 ¶ 95; Doc. 27 at AH 1330–33.)  Dr. Cohan found that the newly provided records did not substantiate the presence of a functional impairment from August 16, 2016, to the date of his report, stating:

> The SPECT scan indicates changes in the claimant's brain associated with traumatic brain injury, various mood disorders, and various anxiety disorders. However, a SPECT scan does not indicate the severity of these issues or how they would affect the claimant's ability to function. The reported diagnoses can range in effect from little to none to severe.  A neuropsychological evaluation does assess the severity of any impairment in function.  In the present case, the claimant did undergo a neuropsychological evaluation but apparently failed

measures of effort, suggesting the results did not accurately represent her ability to function. Therefore, while the SPECT scan does indicate changes in the claimant's brain that could lead to changes in the claimant's function, the extent of any impairment remains unclear.

(Doc. 35 ¶ 95; Doc. 27 at AH 1331.) Moreover, Dr. Holden submitted an Addendum to his neuropsychological evaluation on November 15, 2017, after reviewing the records provided by Plaintiff. (Doc. 35 ¶ 96; Doc. 27 at AH 1336–39.) In his analysis of the new records, Dr. Holden stated:

> The author of the report did emphasize that although there is a body of scientific articles showing certain brain patterns associated with certain psychiatric conditions, the use of SPECT for the evaluation of psychiatric disorders is still an emerging science and in the investigational stage. Findings of brain pattern associated with certain psychiatric condition should not be considered standalone diagnostic measures and should always be considered in conjunction with the clinical condition. "The data should only be used as additional information to add to the clinician's diagnostic impressions." Therefore, at this point in development, research has not established a clear and definitive correlation of brain patterns with functional impairment.

(Doc. 35 ¶ 97; Doc. 27 at AH 1337–38.) He criticized the SPECT examination because it did not assess impairment. (Doc. 27 at AH 1338.) Dr. Holden reiterated in his Addendum, "Based on medical records, there is no unequivocal documentation of functional impairment." (*Id*. at AH 1337.) Despite recognizing that Plaintiff's depression and anxiety could impact her occupational functioning, Dr. Holden opined that she would be able to return to full-time work with some possible limitations or accommodations. (*Id*. at AH 1338–39.)

Sedgwick contacted Plaintiff's counsel on November 15, 2017, and advised that the additional information did not change the appeal determination that had been rendered on May 18, 2017. (Doc. 35 ¶ 98; Doc. 27 at AH 1355.) This suit followed. (Doc. 1.)

## II. Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the

case and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The initial burden is placed on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. *Id*. at 248. A fact is material only when its resolution affects the outcome of the case. *Id*. In determining whether summary judgment is appropriate in a particular case, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in her favor. *Benford v. Correctional Medical Services*, No. 1:11CV121 JAR, 2012 WL 3871948, at *4 (E.D. Mo. Sept. 6, 2012) (citing *Celotex Corp*., 477 U.S. at 331). The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Id.* (citing *Anderson*, 477 U.S. at 249). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)).

### III. Analysis

In reviewing an ERISA complaint, this Court follows the principles laid out in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (discussing the standard of review that federal district courts should employ in reviewing benefits eligibility decisions under ERISA). If an ERISA plan expressly grants discretionary authority to the plan administrator to make benefits determinations and interpret plan terms, this Court reviews the administrator's benefits determination for an abuse of discretion. *Glenn*, 554 U.S. at 111; *see also Zaeske v.*

*Liberty Life Assurance Co. of Boston*, 901 F.3d 944, 948 (8th Cir. 2018) (same). Under the abuse of discretion standard, this Court must uphold a plan administrator's decision "if it is reasonable—that is, if the decision is supported by substantial evidence." *Zaeske*, 901 F.3d at 948 (quoting *Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 989 (8th Cir. 2014)). *See also Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014); *Loeffelholz v. Ascension Health, Inc.*, 73 F. Supp. 3d 1064, 1073 (E.D. Mo. 2014) (quoting *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)) ("To determine whether a plan administrator's decision was arbitrary and capricious, 'we ask whether the decision to deny . . . benefits was supported by substantial evidence, meaning more than a scintilla but less than a preponderance.'"). A decision is reasonable and this Court must affirm "if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 660 (8th Cir. 2017) (emphasis in original) (citation and quotation omitted); *Prezioso*, 748 F.3d at 805; *Kraus v. Ascension Health Long Term Disability Plan*, No. 4:15 CV 718 JMB, 2016 WL 4061880, at *7 (E.D. Mo. July 29, 2016).

Here, the plan confers discretionary authority on the Claims Administrator, in this case Sedgwick, to determine eligibility for receipt or continued receipt of benefits and to make all claims determinations. (Doc. 23 at AH 0017, 0047, 0056.) The parties do not dispute that the abuse of discretion standard therefore applies. (Doc. 33 at 3, 9, 12; Doc. 40 at 4; *See also* Doc. 16 at ¶ 2.) *See also Cooper*, 862 F.3d at 660 (equivalent language is sufficient on its face to trigger the abuse of discretion standard). In considering whether Sedgwick, acting on behalf of

Defendant,[8] abused its discretion in denying LTD benefits to Plaintiff, "'we do not substitute our own weighing of the evidence for that of the administrator.'" *Cooper*, 862 F.3d at 661 (quoting *Gerhardt v. Liberty Life Assurance Co. of Boston*, 736 F.3d 777, 780 (8th Cir. 2013).

Plaintiff makes a variety of arguments in support of her claim that the denial of LTD benefits was arbitrary and capricious, which the Court addresses below. However, given the lenient abuse of discretion standard applied to a plan administrator's denial of benefits and for the reasons discussed below, none of these arguments justify overturning Sedgwick's decision. Sedgwick properly considered all medical records, APS reports, comments, and other information submitted by Plaintiff and her physicians, even information untimely submitted. Sedgwick engaged nine neutral, independent specialists, including those with the same specialties as Plaintiff's providers, throughout the process so that those specialists could review the record and make recommendations. Sedgwick also gave Plaintiff's providers ample opportunities to participate in the process. Contrary to Plaintiff's contention, the record demonstrates Sedgwick based its decision to deny LTD benefits based on substantial evidence.

## A. Treating Physicians v. Reviewing Physicians/Specialists

Many of Plaintiff's arguments center on how Sedgwick allegedly improperly considered and weighed the opinions of the physicians and specialists in this case, particularly the opinion of Dr. Holden, who performed an independent medical examination Sedgwick's behalf. For the following reasons, the Court finds Plaintiff's arguments to be unavailing.

Sedgwick justifiably relied on the opinions of their multiple independent reviewers—all of whom unanimously agreed Plaintiff was not Disabled with the exception of the very short

---

[8] As noted, Sedgwick was the Claims Administrator of Ascension's LTD Plan and made the ultimate decision to deny benefits. (*See, e.g.*, Doc. 26 at 1047–52.) Plaintiff refers to Defendant throughout the relevant pleadings. To avoid confusion, the Court will substitute "Sedgwick" for references to Defendant where appropriate.

period relating to her thyroid surgery—even when those opinions conflicted with the opinions of Plaintiff's treating physicians.[9]  Unlike traditional social security adjudications or similar scenarios, a treating physician is not entitled to special deference under ERISA.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); *see also Zaeske*, 901 F.3d at 950 (citations omitted) ("As a general rule, a plan administrator has discretion to choose between two reliable but conflicting medical opinions. . . . A plan administrator may even prefer the opinion of its own consulting physician over that of an applicant's treating physician); *Cooper*, 862 F.3d at 662 (same); *Whitley v. Standard Ins. Co.*, 815 F.3d 1134, 1142 (8th Cir. 2016) (holding that a plan administrator "was not required to give special deference to the opinions of [claimant's] treating physicians") (citing *Black & Decker*, 538 U.S. at 825); *Kraus*, 2016 WL 4061880, at *14.  It was particularly appropriate here for Sedgwick to rely on the independent medical examiner and other independent reviewers in light of the repeated lack of participation by Plaintiff's treating physicians in the appeals process, detailed above.  *See Cooper*, 862 F.3d at 659 (taking note of treating physicians' failure to respond to independent

---

[9]  To the extent Plaintiff suggests Sedgwick or Defendant hired these independent reviewers and that they acted as a rubber stamp for Sedgwick (Doc. 33 at 7, 10), the record indicates otherwise. (*See*, *e.g.*, Doc. 35 ¶ 69; Doc. 26 at AH 922–1040.)  Moreover, while Plaintiff takes issue with Sedgwick's initial conditional approval and subsequent denial of LTD benefits during the benefits process (Doc. 45 at 5), new evidence was provided and obtained in the interim, and Defendant has set forth a reasonable explanation for the sequence of events (Doc. 36 at 5–8). *See Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 715–16 (8th Cir. 2019) (holding administrator appropriately denied benefits after first granting benefits based on new evidence obtained); *Kraus*, 2016 WL 4061880, at *13 (holding it was appropriate for the defendant to continue to pay benefits for ten months as a placeholder until there could be further evaluation, including a thorough investigation and analysis).

reviewers in affirming denial of benefits).  Furthermore, the records from Plaintiff's treating physicians contained inconsistencies.  For example, while Dr. Crooks completed an APS in which he opined Plaintiff could not return to work from a psychiatric standpoint, he also noted she had a GAF of 70 within days of that APS.  (Doc. 24 at AH 450, 452–53.)  *See McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 923 (8th Cir. 2004) (upholding termination of LTD benefits and noting that a GAF of 70 "is within a range of reasonable psychological functioning").

The Court specifically finds Sedgwick appropriately considered Dr. Holden's opinion during the appeals process.  As an initial matter, Sedgwick was under no obligation to obtain an independent medical examination.  *See Monroe v. Life Ins. Co. of N. Am.*, No. 4:06CV1677CDP, 2007 WL 4564191, at *9 (E.D. Mo. Dec. 20, 2007) (citing *Rutledge v. Liberty Life Assur. Co. of Boston*, 481 F.3d 655, 661 (8th Cir. 2007) and *Torres v. Unum Life Ins. Co. of N. Am.*, 405 F.3d 670, 678 (8th Cir. 2005)).  Plaintiff suggests Sedgwick deliberately withheld Dr. Holden's findings, including his diagnoses of major depressive disorder and panic disorder by failing to provide his report to its retained neuropsychologists.  (Doc. 33 at 4, 8.)  However, Drs. Rinehardt, DeBendetto, and Collins were provided with the same set of records, Dr. Collins specifically mentioned Dr. Holden's report, and all three similarly concluded Plaintiff was not functionally impaired.  (Doc. 26 at AH 1007–08, 1017–18, 1029–30, 1037.)  Moreover, Sedgwick provided those neuropsychologists and Dr. Mendelssohn with records from Plaintiff's treating physicians, who had noted Plaintiff suffered from major depressive disorder and anxiety or panic attacks.  (Doc. 24 at AH 0137, 0220–21, 0227, 0289; Doc. 25 at AH 0447, 0450; Doc. 26 at AH 0850–56.)  Therefore, regardless of Dr. Holden's report, these reviewers were made aware of Plaintiff's depression and panic disorders through these other records.  *See Kraus*, 2016

WL 4061880, at *17 (citing *Rutledge*, 481 F.3d at 660) (the fact that an independent reviewer had access to records discussing the plaintiff's symptoms and diagnoses "means that it was considered, even if it was not explicitly and precisely addressed"). Thus, the Court rejects any suggestion of impropriety and concludes any alleged err is harmless. (*See* Doc. 33 at 8.) *See Cooper*, 862 F.3d at 662–63 (alleged error was harmless when the plaintiff produced no evidence that the error would have altered the plan administrator's ultimate determination of no disability).

The Court further finds Sedgwick did not disregard Dr. Holden's opinion in its letter upholding the adverse LTD benefit determination on appeal. While Plaintiff argues Sedgwick failed to mention or address Dr. Holden's diagnoses in its letter (Doc. 33 at 4, 9), Sedgwick specifically discussed Dr. Holden's report in its letter (Doc. 26 at AH 1047–52). "A plan administrator is not required to discuss and analyze every piece of relevant medical information when issuing a decision on a claim." *Monroe*, 2007 WL 4564191, at *9 (citing *Hillery v. Metropolitan Life Ins. Co.,* 453 F.3d 1087, 1090 (8th Cir. 2006)). *See also Kraus*, 2016 WL 4061880, at *17 (finding no err under deferential review standard when claims administrator allegedly "disregarded" and did not "explicitly and thoroughly analyze" one of the plaintiff's main alleged limitations because the record as a whole demonstrated overall functionality was considered). Therefore, while Plaintiff may have wanted a more thorough explanation of Dr. Holden's opinion, the law does not require this, and Sedgwick, therefore, did not abuse its discretion.

Plaintiff further argues that since Dr. Holden opined Plaintiff had major depressive disorder and other psychological difficulties, she was necessarily unable to perform her Own Occupation and should automatically qualify for LTD benefits, as her treating physicians so concluded. (*See* Doc. 33 at 6–7; Doc. 45 at 2.) However, despite recognizing the psychological

diagnoses, Dr. Holden concluded on two separate occasions that her psychological conditions did not render her functionally impaired such that she was unable to perform her occupation, and he further opined that she could gradually return to full time work with some accommodations. (Doc. 26 at AH 994; Doc. 27 at AH 1338.) *Cf. Cooper*, 862 F.3d at 659 (no abuse of discretion in denying LTD benefits when independent specialist reviewed records and concluded the plaintiff, an Anheuser-Busch business-to-business coordinator, could potentially return to work on a trial basis, though she should be closely followed). As detailed above and discussed more below, this conclusion was consistent with the multitude of other independent reviewers. Here, "[b]ased on the objective evidence, there was at best disagreement between the doctors as to [Plaintiff's] functional abilities, and in such a situation 'plan administrators are not obliged to accord special deference to the opinions of treating physicians.'" *Id*. at 662 (quoting *Black & Decker*, 538 U.S. at 825). Because Dr. Holden's conclusion, along with the conclusions of the other reviewers, "was one 'that a reasonable mind might accept as adequate on this record,'" Sedgwick did not abuse its discretion. *Cooper*, 862 F.3d at 662 (quoting *Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005)).

For these reasons and those that follow, Sedgwick did not abuse its discretion in relying on the independent reviewers' conclusions in making its determination.

## B.  Subjective Complaints v. Objective Evidence

Plaintiff also suggests Sedgwick denied her LTD benefits because she produced no objective medical evidence, or Proof as defined under the Plan, in support of any mental impairment or disability. (Doc. 39 at 3.) Even if that was Defendant's position, that position is not erroneous under the law. *See Cooper*, 862 F.3d at 662 (citations omitted) (holding "it is generally 'not unreasonable for a plan administrator to deny benefits upon a lack of objective

medical evidence"); *Hunt*, 425 F.3d at 490–91 (upholding decision to deny LTD benefits based on lack of objective evidence when the plaintiff self-reported complaints of mental confusion, anxiety, and depression and treating physician opined the plaintiff was totally disabled based on diagnosis, but reviewing physicians gave contrary opinions).

However, that is not Defendant's position. Instead, Defendant contends that while the general categories of evidence in Plaintiff's records may constitute objective medical evidence, "Plaintiff did not provide objective medical evidence that, in the discretion of Sedgwick, *substantiated the existence of a Disability as defined in the Plan*." (emphasis in original) (Doc. 46 at 4; *see also* Doc. 40 at 7–8.) *Cf. Cooper*, 862 F.3d at 654 (citation omitted) (holding it is "especially" reasonable for a plan administrator to rely on a lack of objective indicia of disability to the exclusion of subjective indicia when the plan administrator's "purpose is to substantiate the extent of disability rather than to question the diagnosis."). Defendant contends Plaintiff's own subjective, self-reported symptoms do not justify overturning Sedgwick's decision because Sedgwick reasonably considered Plaintiff's treating and reviewing physicians' opinions that her symptoms were overstated or exaggerated based on validity testing. (Doc. 46 at 3–5.) The Court agrees.

Neuropsychological validity testing is a reasonable method to evaluate a plaintiff's occupational limitations. Quoting at length to *Hopkins v. AT&T Umbrella Benefit Plan No. 1*, No. 5:12-CV-00102-NKL, 2013 WL 12144078, at *13 (W.D. Mo. June 4, 2013) (citing, *inter alia*, *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838–39 (8th Cir. 2006)), Plaintiff suggests that it is not clear what more evidence could have been obtained since clinical judgments regarding mental illness often rely significantly on subjective self-reports, and it would be unreasonable for Sedgwick to demand the impossible. (*See* Doc. 39 at 3–5.) However, the

Eighth Circuit very recently addressed neuropsychological validity testing in the context of ERISA LTD benefits claims. *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 713–14 (8th Cir. 2019).[10] In that case, despite the plaintiff's diagnosis of a moderate to severe cognitive impairment and evidence suggestive of a disability, Plaintiff failed multiple validity tests administered by two independent neuropsychologists. *Id.* As a result, the Eighth Circuit upheld the decision to terminate LTD benefits based on these tests that "objectively measure[d] validity," finding the standard of review dispositive. *Id.* at 715–16. Therefore, contrary to Plaintiff's contention, "this is not the type of case contemplated in *Pralutsky* in which 'objective evidence simply cannot be obtained, and it would be unreasonable for an administrator to demand the impossible.'" *Johnson v. Metro. Life Ins. Co.*, 437 F.3d at 809, 814–15 (8th Cir. 2006) (quoting *Pralutsky*, 435 F.3d at 839). Instead, "there are multiple established ways to test validity of a neuropsychological examination." *Johnston*, 916 F.3d at 716. As such, the Court is not persuaded by *Hopkins*.

In this case, Sedgwick reasonably relied in large part on Plaintiff's failed neuropsychological validity tests concluding that Plaintiff was not functionally limited, and doing so was not an abuse of discretion. The two times Plaintiff received validity testing—first by a doctor recommended by her own treating physician and then by an independent medical examiner in the course of the benefits process—the results indicated invalid results or symptom exaggeration. *See Johnson*, 437 F.3d at 809, 814–15 (substantial evidence supported denial of

---

[10] In *Johnston*, the plaintiff suffered complications from hydrocephalus, which led to surgery to remove a cyst from his brain. 916 F.3d at 713. As a result, his treating physician diagnosed him with a moderate to severe cognitive impairment and opined he was unable to return to work as engineer in the computer department at his company. *Id.* The plaintiff alleged he was unable to maintain the focus and concentration needed for his job. *Id.* The plaintiff's LTD benefits were initially approved, but during a periodic review of his claim, the plaintiff failed neuropsychological validity testing. *Id.* at 713–714. The Eighth Circuit upheld the decision to discontinue LTD benefits based on the failed validity testing. *Id.* at 715–16.

LTD benefits in part because even one of the plaintiff's own physicians suspected the plaintiff was exaggerating her symptoms). Dr. Meyers-Fabian's and Dr. Holden's opinions of inconclusiveness or symptom exaggeration and Plaintiff's resulting lack of functional limitations were not "a purely subjective or opinion-based determination" but were instead reasonably based on tests that "objectively measure validity." *Johnston*, 916 F.3d at 716. Multiple additional reviewers referenced Dr. Myers-Fabian's and Dr. Holden's validity test findings in concluding Plaintiff did not have functional limitations that prevented her from performing her job.[11]

Multiple reviewers also discounted Dr. Frey's findings on cognitive dysfunction because he admittedly failed to perform any validity testing to corroborate his results. Moreover, Dr. Frey's testing was performed in close proximity to Dr. Myers-Fabian's testing, which Dr. Myers-Fabian specifically cautioned would render the test invalid. While there was some suggestion that the validity results also could have resulted from psychological difficulties or other factors such as Plaintiff not eating breakfast before the testing (Doc. 33 at 5–6; Doc. 39 at 8–9), Sedgwick was entitled to interpret and weigh the results in accord with the totality of the record, and the Court cannot say Sedgwick abused its discretion. *See Cooper*, 862 F.3d at 661 (court will not reweigh evidence); *Kraus*, 2016 WL 4061880, at *17 (court must look at record as a whole); *Monroe*, 2007 WL 4564191, at *9 ("Plan administrators have broad discretion to interpret a plan's terms and to assess the weight and credibility of evidence."). Given the contradiction in evidence,

_____

[11] To the extent Plaintiff suggests Sedgwick erroneously relied on these independent reviewers' opinions because of how those reviewers interpreted and relied on the validity testing in reaching their conclusions, the Court disagrees. *See Zaekse*, 901 F.3d at 948–50 (because reviewer's opinion rested on a reasonable interpretation of the plaintiff's medical records, his opinion was sufficiently reliable to support the decision to deny LTD benefits); *Moore v. Ascension Long– Term Disability Plan*, No. 4:15CV328 JCH, 2016 WL 3647862, at *13 (E.D. Mo. July 1, 2016) (citations omitted) (holding the record did not support denial of benefits when all four physicians reviewing the plaintiff's file, including one physician who performed a physical examination, concluded the plaintiff was not so disabled as to require LTD benefits after noting there was little or no objective evidence of impairment).

Sedgwick was entitled to credit the opinions of Dr. Myers-Fabian, Dr. Holden, and the other independent reviewers over the opinions of Dr. Frey and Plaintiff's other treating physicians. *See Black & Decker*, 538 U.S. at 834; *Zaeske*, 901 F.3d at 950; *Cooper*, 862 F.3d at 662; *Kraus*, 2016 WL 4061880, at *14; *Monroe*, 2007 WL 4564191, at *9 (citing *Rutledge*, 481 F.3d at 660) ("As a general rule, where medical opinions conflict, a plan administrator does not commit a procedural error by choosing to favor one opinion over the other.").

In addition to the validity testing, additional objective medical evidence from Plaintiff's own providers undercuts her argument. For example, the EEG ordered by Plaintiff's treating neurologist, Dr. Bertelson, demonstrated normal results. Dr. Bertelson also concluded Plaintiff's symptoms were unusual to be purely due to a traumatic brain injury. In fact, Defendant is correct in noting that Plaintiff's alleged basis for Disability has been inconsistent throughout the benefits process. (Doc. 40 at 1.) She first claimed she was disabled as a result of mental health symptoms due to traumatic brain injury from her auto accident. She then claimed for the first time during the benefits appeals process that she was permanently disabled from early onset of Alzheimer's and that her anxiety, panic, and other mental health symptoms were early signs of this disease. However, she failed to produce objective evidence in support of her Alzheimer's claim. Before this Court, Plaintiff has again returned to the argument that a traumatic brain injury resulted in her Disability. She now asks the Court to allow her to raise additional yet unspecified disabling conditions, which she alleges began during the relevant period, beyond mental illness. (Doc. 33 at 14–15.) The lack of consistency in Plaintiff's position further supports Sedgwick's ultimate conclusion.

Moreover, Sedgwick's handling of the late-submitted SPECT scan evidence does not amount to an abuse of discretion. Plaintiff argues Sedgwick disregarded Dr. Vaughn's and Dr.

Holden's reports following review of the SPECT scan. (Doc. 33 at 10–12.) First, Sedgwick was under no obligation to review this evidence, as it is undisputed that Plaintiff submitted the evidence after the final benefits decision and under the threat of litigation. (Doc. 1 ¶ 6; Doc. 35 ¶ 91; Doc. 27 at AH 1292–93.) Second, despite the equivocal results on the SPECT, Sedgwick decided to have it reviewed by not one, but two, independent reviewers. *Compare Cooper*, 862 F.3d at 659, 662 (decision not to forward objective diagnostic report received late in benefits process to independent reviewer was not an abuse of discretion when the report would not have changed the final decision). To the extent Plaintiff suggests it was unreasonable to send the SPECT to Dr. Vaughn without providing Plaintiff's complete medical records (Doc. 33 at 10), Plaintiff cites no law in support of this position, and the Court finds any alleged err was harmless. Dr. Holden had reviewed Plaintiff's file and examined Plaintiff, and multiple independent reviewers had already reviewed Plaintiff's claims. Regardless, the Court finds Plaintiff has not established that a reasonable person would have reached a different outcome based on the SPECT. *See Cooper*, 862 F.3d at 660, 662–63. For example, Dr. Holden and Dr. Vaughn similarly concluded that the SPECT did not substantiate the presence of a Disabling functional impairment, Dr. Holden reaffirmed that Plaintiff could return to work full time with accommodations despite the SPECT results, and both Dr. Holden and the SPECT evaluator acknowledged that the science was only emerging. Furthermore, to the extent Plaintiff argues Sedgwick should have included a more robust discussion of its reasons for discounting the SPECT results (Doc. 33 at 12), the Court finds Sedgwick did not violate the lenient abuse of discretion standard by failing to do so. *See Kraus*, 2016 WL 4061880, at *17 (finding no error when administrator did not explicitly and thoroughly analyze an alleged limitation).

Finally, to the extent Plaintiff identifies additional records or objective evidence that support her allegations not specifically addressed here, this Court must affirm "if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Cooper*, 862 F.3d at 660 (emphasis in original) (citation and quotation omitted). *See also Mulholland v. Mastercard Worldwide*, 174 F. Supp. 3d 1067, 1072 (E.D. Mo. 2016) (quoting *Schatz*, 220 F.3d at 949) ("'Provided the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made.'") While Plaintiff had mental health diagnoses and subjective symptoms and complaints, Sedgwick reasonably found the evidence of record did not support the conclusion that her impairments rendered her unable to perform her Own Occupation. *See Cooper*, 862 F.3d at 659–60; *Coker v. Metro. Life. Ins. Co.*, 281 F.3d 793, 798–99 (8th Cir. 2002). "While another interpretation of [Plaintiff's] medical records could support [her] eligibility for benefits, the assessments of [the independent reviewers] were not outside the range of reasonableness, and it was not an abuse of discretion for [Sedgwick] to rely on them." *Zaeske*, 901 F.3d at 948–49. *See also Coker*, 281 F.3d at 799 ("Although reasonable physicians could disagree on the extent of [Plaintiff's] disability, [the] denial of benefits, based on the objective evidence of medical tests presented, is not unreasonable" based on the deferential review accorded to a plan administrator.)

## C. Social Security Administration Disability Determination & Vocational Expert

Plaintiff argues that the Social Security Administration's disability determination supports a finding that she is entitled to LTD benefits. However, the Eighth Circuit has repeatedly and consistently held that an ERISA administrator is not bound by an SSA determination. *See, e.g., Johnston*, 916 F.3d at 715 (ERISA claims administrator not bound by

SSA disability determination); *Prezioso*, 748 F.3d at 806 (citations omitted) (an ERISA plan administrator or fiduciary is not bound by an SSA determination that a plan participant is disabled); *Rutledge*, 481 F.3d at 660–61 (same); *Farfalla v. Mutual of Omaha Ins. Co.,* 324 F.3d 971, 975 (8th Cir. 2003) (internal quotations and alterations omitted) ("[A]n ERISA plan administrator or fiduciary generally is not bound by an SSA determination that a plan participant is disabled, even when the plan's definition of disabled is similar to the definition the SSA applied."); *Coker*, 281 F.3d at 798 (citations omitted) ("The determination that [the plaintiff] suffers from a . . . disability under Social Security regulations does not require [the administrator] to reach the same conclusion."); *Schatz,* 220 F.3d at 950, n.9 (finding no abuse of discretion when the plaintiff was granted SSA disability benefits while having been denied LTD benefits due to "different standards governing social security and ERISA determinations" and because "reasonable minds could disagree" about the extent to which the plaintiff's condition impairs her ability to work).

Under the facts of this case, the Court finds Sedgwick did not abuse its discretion in failing to credit the SSA determination. First, Sedgwick relied on the opinions of independent reviewers who explicitly or implicitly discounted the SSA determination. For example, both Dr. Holden and Dr. Collins specifically addressed the SSA determination, including Dr. Forgus's opinions, and explained why they disagreed with his opinion. Dr. Holden explained that Plaintiff's cognitive problems were "mild in nature, if that," due to over-reporting of symptoms and that the SSA decision may create "a self-fulfilling prophecy of inability to function." (Doc. 26 at AH 995.) Drs. Rinehardt, DeBendetto, and Dr. Collins were all provided with SSA documents, including Dr. Forgus's opinions, and Dr. Collins discussed the disability documents in detail, yet they all concluded Plaintiff did not suffer from functional impairments. (Doc. 26 at

AH 1007, 1017, 1029, 1033.) *See*, *e.g.*, *Prezioso*, 748 F.3d at 806 (no abuse of discretion in discounting SSA disability finding when independent reviewers explained in reports to administrator why they disagreed with SSA determination). Second, Sedgwick explicitly addressed the SSA determination in its denial letter and took it into account. (Doc. 26 at AH 1051–52.) However, Sedgwick ultimately discounted the determination because a different definition of disability applies, the SSA gives special deference to treating physicians, and other factors were considered in making the LTD benefits decision. (*Id*.) *See*, *e.g.*, *Johnston*, 916 F.3d at 715 (administrator did not abuse discretion in denying LTD benefits even though the plaintiff was found disabled under SSA standards when administrator also had evidence of symptom exaggeration based on neuropsychological validity testing). Sedgwick more than met its obligation to consider the SSA determination. *See Rutledge*, 481 F.3d at 660 (holding that where a social security decision "was in the claim file, and [the administrator's] decision was made based upon consideration of the entire file," the administrator did not error in failing to even mention the social security decision at all because the administrator "was not required to specifically mention each document it considered in reaching its decision"); *Kraus*, 2016 WL 4061880, at *17–18 (citing *Rutledge*) (holding "it is not a rule in the Eighth Circuit" that the administrator must discuss an SSA determination).

Furthermore, Sedgwick did not abuse its discretion or deny Plaintiff a full and fair review by failing to retain a vocational expert in addition to the multiple independent specialists who reviewed the case. In arguing that Sedgwick was required to seek a vocational assessment to challenge the SSA vocational assessment, Plaintiff seems to improperly shift the burden of proof

to Sedgwick, yet Plaintiff cites to no binding law in support of this position.[12]  (Doc 33 at 13–14; Doc. 39 at 2–3.)  *See Johnston*, 916 F.3d at 715–716 (declining to adopt the plaintiff's proposed burden-shifting approach "because no authority requires shifting the burden of proof" to the administrator).  As non-binding case law cited by Plaintiff recognizes, the Eighth Circuit has not adopted any *per se* rule requiring vocational assessments in ERISA cases.  *Hopkins*, 2013 WL 12144078, at *14.[13]  In fact, the Eighth Circuit recently upheld the denial of benefits when an ERISA administrator did not consult a vocational expert but relied on the opinion of a specialist who was provided the plaintiff's job description.  *See Cooper*, 862 F.3d at 659.  Here, not one, but several independent specialists were provided with Plaintiff's job description.  Plaintiff's occupational description was included in the information provided to Drs. Mendelssohn, Holden, Rinehardt, DeBendetto, and Collins.  (Doc. 26 at AH 930, 991, 1008, 1022, 1032.)  Dr. Vaughn also noted Plaintiff's occupation in his post-appeal report reviewing the SPECT.  (*Id.* at AH 1331.)  All of these specialists concluded the evidence did not establish Plaintiff was functionally impaired, and Sedgwick clearly noted that the SSA applies different standards.  For all of these reasons, the Court does not find Sedgwick abused its discretion in failing to retain a VE.

In sum, the mere fact that Plaintiff was awarded benefits by the Social Security Administration does not bind Sedgwick to a similar outcome or to an in-depth explanation of its contrary reasoning.  Sedgwick offered a reasonable explanation as to why it could reasonably

---

[12] Defendant's Plan placed the burden of Proof satisfactory on Plaintiff.  (Doc. 23 at AH 0025.) *See Johnston*, 916 F.3d at 715 (emphasis added) (quoting *Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)) ("Because ERISA allows a beneficiary to sue 'to recover benefits due to him *under* the terms of his plan,' a plan may place the burden of proving eligibility on the beneficiary.").

[13] In fact, the non-binding cases cited in *Hopkins* that did require vocational evaluation involved the broader "any occupation" standard, not the narrower "own occupation" standard at issue in this case.  *Hopkins*, 2013 WL 12144078, at *14.  *See also* Doc. 46 at 3.

come to a different conclusion from that of the Social Security Administration, and the Court

finds no abuse of discretion.  *See Kraus*, 2016 WL 4061880, at *18.

## D.  Conflict of Interest

Plaintiff argues Sedgwick's discretionary decision should be set aside because Defendant

sought and obtained a subrogation interest in Plaintiff's personal injury recovery arising out of

the motor vehicle collision which Plaintiff claims caused her traumatic brain injury.  (Doc. 45 at

4.)  Since Defendant both sought subrogation and denied LTD benefits, Plaintiff argues

Defendant took inconsistent opinions which were financially advantageous and suggest

procedural unreasonableness.  (*Id*.)  To the extent Plaintiff argues that a less deferential standard

of review should apply or that the decision should be reversed due to a conflict of interest, the

Court finds this argument unprevailing.  Plaintiff has not properly raised the conflict of interest

in this case, nor has she made the requisite showing to warrant less deferential review or

otherwise change the outcome.  *See Huang v. Life Ins. Co. of N. Am.*, 47 F. Supp. 3d 890, 903

(E.D. Mo. 2014), *aff'd sub nom. Yafei Huang v. Life Ins. Co. of N. Am.*, 801 F.3d 892 (8th Cir.

2015).  For example, she neither raised a conflict of interest in her Complaint nor raised it during

the course of the Rule 16 Scheduling Conference or discovery processes.  (Docs. 1, 16.)  Instead,

she seems to have raised it for the first time in her reply to Plaintiff's Motion for Summary

Judgment.[14]  Regardless, even if the Court were to consider the conflict of interest as one factor,

---

[14]  New arguments raised by Plaintiff in her reply will not be considered.  *See, e.g., Fay Fish v. United States*, 748 F. App'x 91, 92 n.2 (8th Cir. 2019) (reply brief is "too late" to properly raise a new argument); *United States v. Morris*, 723 F.3d 934, 942 (8th Cir. 2013) (internal quotations and citations omitted) ("[W]e do not generally consider new arguments raised in a reply brief");

the Court would assign it minimal weight. The Eighth Circuit "has consistently rejected the notion that the mere presence of a potential conflict of interest is sufficient to warrant a less deferential standard of review." *Cooper*, 862 F.3d at 660 (citations omitted). While a potential conflict of interest must be weighed as a factor, the weight given depends on facts presented to the Court such as evidence that the insurer's claims review process was tainted by bias; that the medical professionals who reviewed the claim for benefits were employed by the insurer, or that their compensation was tied to their findings; and that the insurer acted as little more than a rubberstamp for favorable medical opinions. *Id*. at 660–61 (citations omitted). As in *Cooper*, the record suggests that Sedgwick conducted a careful and thorough review of all of the documents provided to it and it relied on the medical expertise of numerous appropriately qualified independent experts in making its final decision. *See id*. at 661. Therefore, even weighing the potential conflict of interest as one factor, the Court would still find Defendant did not abuse its discretion in denying Plaintiff's claims for supplemental benefits.

## IV. Conclusion

In conclusion, based on the undisputed facts in the record and the applicable law, the Court finds that substantial evidence supports Sedgwick's decision to deny LTD benefits. Sedgwick provided Plaintiff with the "full and fair review" ERISA required before denying her appeal. The Court may find an abuse of discretion "[o]nly when the evidence relied on is 'overwhelmed by contrary evidence.'" *Whitley*, 815 F.3d at 1442 (quoting *Coker*, 281 F.3d at 799). That is not the case here. *See Whitley*, 815 F.3d at 1142 (citing *Hunt*, 425 F.3d at 489) ("In view of the conflicting opinions contained in the voluminous administrative record, [the]

---

*Hug v. Am. Traffic Sols., Inc.*, No. 4:14CV00138 ERW, 2014 WL 2611832, at *6 n.1 (E.D. Mo. June 11, 2014) (refusing to address new argument raised in reply brief).

decision to deny [the plaintiff's] claim based on the opinions of its independent consultants was not an abuse of discretion."); *Monroe*, 2007 WL 4564191, at *9 (citing *Weidner v. Fed. Express Corp.*, 492 F.3d 925, 928 (8th Cir. 2007)) ("Objections to the manner in which evidence was weighed and the conclusions reached are substantive disagreements with a plan administrator's analysis, and do not reflect procedural irregularities.").  The Court's duty is to examine the record and determine whether a reasonable person *could* have—not *would* have—reached a similar decision.  *See Cooper*, 862 F.3d at 660.  A reasonable person could have decided that Plaintiff is not Disabled under the terms of the ERISA plan at issue here.  That is all that is required under the deferential standard of review.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 33) is **DENIED**.

**IT IS FURTHER ORDERED** that Ascension's Motion for Summary Judgment (Doc. 34) is **GRANTED** and that this case is **DISMISSED** with prejudice.

A separate judgment will accompany this Order.

Dated this 22nd day of May, 2019.

    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE